and we'll begin with Ms. Stage. Good morning and may it please the court. My name is Gail Stage and I represent Henry Vasquez Valois in this case. There are two other co-defendants and we have chosen to split up our time. I will deal with the Maritime Drug Law Enforcement Act and Mr. Clu will be dealing with the safety valve issue and the Garcia hearing. Both of you are taking five minutes in your initial argument and then you're splitting rebuttal. That is correct, Your Honor. So, initially, the Maritime Drug Law Enforcement Act, otherwise known and commonly called the MDLEA, is arguably the most expansive grant of extraterritorial criminal jurisdiction in the U.S. Code. It subjects any individual found aboard a vessel that is broadly defined to be subject to the U.S. law and not limited to U.S. citizens or residents. It's used to prosecute drug trafficking offenses by foreign actors in international waters for trafficking drugs that were never intended to reach the United States. Additionally, Congress has chosen to take the jurisdictional questions out of the jury's consideration. The issue that I have raised are three issues relating specifically to whether the act is constitutional. I believe that the court is familiar with those issues. They've been argued repeatedly. Many cases have been written about them. I understand, even as recently as the Castillo opinion, which was cited as supplemental authority by the government, that the arguments that we have raised are foreclosed by the prior panel precedent rule. And until this is considered en banc, the Supreme Court steps in, or there's a major change in the statutory law, then this panel will be bound by other panels, including Tinoco, Campbell, Rendon, Cruikshank, Wilcham, and a whole host of other decisions. So at this point, what I would like to do is ask the court if you have any specific questions of me and of the arguments that I raised relating to our position where the MDLEA is concerned. We raised this issue. We raised the constitutionality. We raised the lack of nexus. We raised the confrontation law issues because we have to preserve them for appeal. And we hope that the Supreme Court will step in and help to clarify conflicts in the various circuits relating to the jurisdictional issue and some other issues. Out of the issues that you are going to deal with, is there any that is not bound by precedent? I think they all are. No, Your Honor. There are none. All right. And I have a question about the Senate, and I say this so when Mr. Kluge gets up on the podium to address whether I have got this right or not. As I understood, because of the volume of drugs here, 640 kilograms of cocaine, I just want to make sure I understood the record, the boat captain, master, whatever . . . My client. Your client. He was facing under the guidance 360 months to life, and his sentence was 144 months. Is that correct? That is correct, Your Honor. I just wanted to make sure I wasn't under a misunderstanding. The other two defendants in this case were, I think they were facing 235 months to 293 months, and the district court judge gave them the mandatory minimum of 120 months. That's correct. My client . . . Your client had one more two-level increase because he was the master captain of the ship, and so that's basically the sentencing picture we are looking at before we get to the safety valve issue. Yes. He also testified. None of the other defendants testified at trial, and so there was an additional two levels. I didn't want to take up Mr. Kluge's time, since you had some time left, I'd do it on your time. Thank you. That's very helpful for the context of where we are in this case. Just so you know, the issue of safety valve . . . Obviously, the district court . . . this was a huge downward variance. There's no criminal history category. They've obviously been paid. They're not the big guys here. They're the . . . Right. . . . lesser offenders, nonetheless. It was 640 kilograms of cocaine on this one boat. Is that correct? Yes, Your Honor. Well, no drugs were actually found on the boat, but . . . I know that Coast Guard said they saw him bailing them out of the boat. Yes. I just wanted the court to know that Mr. Vasquez-Veloz's trial counsel did not object to the lack of his client, probably because of the leadership role that was put upon him, and we did not join in that adoption of our co-defendants. Thank you. That was very helpful. Thank you. Thank you, Your Honor. Thank you very much, Ms. Stage. Mr. Kluge. Good morning. Since we're dealing with foreclosed, or possibly foreclosed issues, I thought I might address first the issue of the safety valve, and again, as Judge Hall points out, it would only be relevant to the mandatory minimum. It would not be relevant for the guideline component of the safety valve, so that the district judge would have, had he applied the safety valve, been able to impose a sentence even below the 120-month sentence for the two crew members. The status of the case that is the binding precedent of this court, as Castillo, is that it's going to be conferenced by the Supreme Court on January 4th. It's case number 18-374 in the Supreme Court. So I would urge the court to hold off any action on that issue, at least until that period of time. The case that the government . . . By conference, you mean a cert petition? Yes. The government . . . Not, they haven't granted cert yet on the issue, right? They have not. Okay. They have not. The only reason I suggest that is the government acknowledged in its response in the Castillo cert that there is a conflict. They say it's a three-to-one conflict. The conflict is created by the case that we cited as supplemental authority, Muscara, from the D.C. Circuit, and it's being handled by . . . it's a very reputable Supreme Court practice that is handling the case. It's quite possible that cert might be granted in that case in this particular context, whereas in other cases it might not be worth holding off. In this case, it might. Beyond that issue, I wanted to turn . . . I do want to address the other issues that were preserved principally in the brief for Mr. . . . who I've described as Mr. Valencia, Luis Valencia. I call my client Puerto Carrero, he's of Puerto Carrero, Valencia. I do want to get to those, but the issue that I principally raised that is principally applicable to my client, but arguably applicable to each of the clients, each of the defendants, is the conflict issue. This was a particularly problematic case in terms of why, in a joint drug operation, two destinations, very close to each other, exactly the same time, one's caught first, one boat is captured first, and the other boat is captured essentially the next day. They are brought . . . they're then put on the same Coast Guard cutter together, they are brought into Key West for their initial appearance, and because apparently three lawyers were down there, the court appointed the same three lawyers to both cases, and because the government apparently felt at that time it didn't have what it needed to put them all in one indictment, it put them in two indictments. Clearly, the error begins there. There is . . . Well, Mr. . . . let me just speak for myself. I think it is not a good practice to appoint three lawyers for six defendants in two related cases because you could easily see problems arising, but how did any conflict actually materialize in this case that prejudiced any of the defendants in this case? Well, I would note that there was a belated Garcia motion by the government. The government eventually acknowledged the conflict. They tried to characterize it as potential, but it was real at that very moment, even as they're characterizing it potential. Even at the post-trial stage, it was still there, and the government acknowledged it. It became very manifest during the trial. It exists as soon as a major decision about whether somebody testifies or not, whether somebody cooperates against the other person or not. So it existed at every stage of the trial, a case even before the trial, but clearly at the trial where my client's attorney is the only attorney who says nothing. He will say nothing against his other client. He will say nothing against the other operation. One of the other defendants in this case, both of the other defendants in this case, their counsel at least cross-examined the Coast Guard to try to say, no, these drugs came from that other boat. And then one of the other defendants' counsel argued to the jury, you know, the government has just absolutely failed to show these drugs came from this boat. There's another boat out there. It must have come from this boat. And the government then, as we have as a separate issue, it's sort of an either-or type of issue, that the government then argues, yes, of course it was a conspiracy. Of course they're together. Of course it's one operation. So that you have this fiction that occurs because the government is unsure about the indictment initially. And it just sits there and evolves in every normal conflict way all along the process until it explodes into a giant conflict at trial. And of course there is no Garcia hearing ever filed in this case, as a Garcia hearing filed in the other case. And there's no waiver ever of the conflict that occurred at trial. So it seems clear to me this is just a very simple, straightforward case where this should not have happened. This defendant clearly is a, you know, Spanish-speaking, Colombian defendant with no criminal experience. It cannot simply be said that he did anything to cause this to occur. The other issue... I thought there was a Garcia hearing post-trial in this case. There was a Garcia motion, there was a Garcia hearing post-trial. In this case? I think you just said there was never a Garcia hearing in this case. There was a Garcia hearing as to these three defendants and their counsel. There was a Garcia motion filed in the other case, and then all of the defendants were brought together in a joint Garcia hearing. And they were all sitting there together. The two cases were merged in one situation. One set of defendants going to trial. I have a transcript here. It's filed in this case. They may have filed the same transcript. But there was a Garcia hearing in this case, sir. Correct? Post-trial. Yes. Yes. I don't think... I just think it's very important to be precise as to what occurred and why it occurred. And that is because the government has said that this hearing should have some relevance to the trial. And it has no relevance to the trial at all. It has no relevance to the conflict at trial. If this were... We have challenged the Garcia hearing. That can't be right, Mr. Kluwe. I mean, you may think it's inadequate and too late, but of course it's relevant because your very argument is that there should have been at the very least a Garcia hearing pretrial. So how can the holding of a Garcia hearing post-trial not be relevant at all to the trial? Well, because of the very specific nature of the Garcia hearing. This was not a Garcia hearing about anything other than conflicts that may arise going forward. In other words, the magistrate who conducted it, and it was not conducted by the judge who conducted the trial, who had knowledge of what happened at trial. It was conducted by a magistrate who had not witnessed the trial. And the hearing was over and over and over again, and it's in the written documents as well as the hearing. The conflict is not, I waive any conflict that may have occurred over the year that I've been represented by this attorney. No. It never sought that. It never addressed that in any way. The government didn't seek that. Nobody purported for that to be the case. The conflict was, do you object to any conflict that may arise from here on in? So it was all forward-looking? All forward-looking, 1,000% forward-looking as to that. But I still insist, and we've argued in our brief, that it was completely misleading and in no way compliant with Garcia, because it didn't acknowledge the facts. It didn't acknowledge anything. Instead, it had the magistrate saying, there's no conflict here. I have no idea. There's absolutely no conflict here. In other words, the magistrate, in ignorance of the record and in defiance of the record, tells the defendant there's absolutely no conflict here, when there was an obvious conflict here. I want to make sure I understand the record with respect to the blame-shifting argument. Didn't counsel for Valencia make the blame-shifting argument, even though he also represented a client from the other vessel? Yes, and he has not joined. He has not joined because he is not claiming actual conflict. Right, but doesn't that show that the blame-shifting argument could be made, even while representing clients on each of the vessels? Exactly. Exactly my point. And that is exactly what did not occur. And that is, once you show that that blame-shifting argument was there, once you have the government then jumping in in what we argue was an improper effort from our standpoint, was an improper effort at that point, which was not cured by a 404B instruction because it wasn't 404B. Once you have that, then you have that clear fork in the road, is the famous expression, the Yogi Berra expression, if you see a fork in the road, take it. When it comes to actual prejudice in a conflict case, what you show to show the prejudice is you show the fork in the road. And that's the fork in the road. We've got it clearly laid out. There was a fork there in the road. My client's lawyer chose the fork that said, I'm going to protect my other client. That's the actual conflict. I think that that's well settled. Is there any other reason that he might have chosen not to make that argument since a similarly situated lawyer did make that same argument without any trouble? Well, I think, and I think that's what we cited as supplemental authority. The Williams case in which Judge Jordan, I believe, either authored it or I believe did author it, in which the court chose the lesser remedy, which is to remand for a truly inadequate and fully developed revelation of these issues. And there could possibly, I don't see it, but there could possibly be an explanation. What I see instead is an attorney, when you look at the hearing, you see an attorney who's simply not focusing on the conflict. He's saying, well, my client didn't really get to know the other guy until they were on the boat. Well, that's important that he got to know him on the boat. A lot of things happened on that boat. The case against Ms. Stages' client is happily proven by what happened on that boat. You just represented the hearing was only about going forward in representation, but I'm reading the transcript of the hearing and they particularly talk about their, of the testimony that came out about the similarity of the boats and the cases and the identical quantities of controlled substance were packaged virtually identically. They go through the similarity between the two boats, how there was testimony at trial about whether there was possibly the drugs that were found came from the other boat. I don't understand how you can accurately represent this was only looking as to a forward looking representation as to what had happened at trial and do they waive any conflict about it? I can quote the government's brief itself. I don't know what more I can do to be accurate and forthcoming, Your Honor, than to quote the government's brief itself. But did they not go into the fact that this had happened at trial at the hearing and ask them whether they waived any conflict? Only in order to address the magistrate's dispute that she says she didn't see a conflict. Because you see, the magistrate had been the one that committed the error in the first place. The magistrate who was sitting there holding the Garcia hearing, who had not been at trial, had been the one who had appointed all these people. Let me see if I can ask it another way. Is it a fair representation to say, subsequent to the trial, the lawyers discussed with their about and what had happened at trial and they all then said, the lawyers said it too. They didn't see a conflict. I think that's what the lawyers represented to the court. Is that correct? They may have been wrong, but didn't the lawyers represent too, Judge Snow, the magistrate? We don't see a conflict? I'm not sure. My client's lawyer did represent that. I'm not sure I can say the same for Ms. Stages' client. And then after that, didn't they say, we've talked to them in the lockup and then they all, the defendants came forward and say they understood and they want to waive and they want to keep their same lawyer? Your Honor, there is no question that my client said he spoke to the two clients. He didn't say he spoke to them separately. Certainly there was no independent counsel that came in to them. He said he spoke to them, two of them. There were two of them that were sitting there together.  They didn't speak to him in court. They spoke to him prior to them coming to the hearing. I'm not sure that that's clear from the record at all, Your Honor. How is it clear that they didn't? Well, it's not clear. It's not clear either way. But the point about it is- You'll have to go through it. I think they talked to him in the lockup now. I will say I don't know whether they both were in the same lockup or not. He's answered my questions and we're over. I haven't had a chance to answer the one question, if I could. You can go ahead, but we've taken you way over your time. You can go ahead and answer the question, Mr. Kluge. The record leaves no doubt whatsoever that the only waiver extracted from my client, and improperly, I might add, was the sentencing representation. That's it. All right, thank you. You've saved your full time for rebuttal. Mr. DeRosa? Good morning. May it please the court. Philip DeRosa on behalf of the United States. I'd like to introduce, sitting with me at council table, Mr. Chris Clark, who was one of the two trial attorneys in this case. I want to just touch very briefly on the sentencing issue about the safety valve before I go right to the Garcia conflict issue. Mr. Luis Valencia lost the argument right out of the gate because he didn't preserve the issue in the district court, but I filed the supplemental authority, the Wilson case, which basically puts the nail in the coffin to this idea that the safety valve violates the equal protection clause of the Constitution. That argument has been foreclosed like all of the MDLEA arguments. With respect to the Garcia here and the conflict of interest, I take issue, Judge Jordan, with your observation that it's problematic what the magistrate judge did in Key West. Let me give you this thought and then you can tell me why I'm wrong. I may well be. If one of these clients in one of the two cases had decided to cooperate with the government against the other five defendants, tell me how that plays out. At that time, it would have been an actual conflict. That's why I said there's a potential conflict when you appoint them that way, and it could turn into something pretty bad. The premise of your argument is that the magistrate judge knew that that might happen. There was nothing, nothing to indicate that these cases were related at the time that they all showed up in Key West. If you think that that's good practice, then you and I just have a disagreement. I'm not saying it's reversible error, Mr. DeRosa. What I'm saying is that is not good practice, especially when we have so many good available criminal defense lawyers around. That's just my only point, but you can go ahead and tell me why I'm mistaken about that. Mr. DeRosa says that Mr. Juan De Jesus Gonzalez, who represented the defendant Diego Portocarrero Valencia in this case below, had an actual conflict because his loyalty to the defendant Serbio Vietes Valencia, no relation, in the other case, precluded him from pursuing the defense that Serbio and his co-defendants were responsible for the cocaine in this case. Mr. Clu says that the other defense counsels pursued this blame shifting strategy, but not Mr. Gonzalez. That statement is wholly inaccurate. All three of the defense attorneys in this case below helped, in one way or another, to pursue a consistent uniform theory of the defense, and that is that the cocaine seized by the United States Coast Guard did not come from their client's vessel, but came from the other vessel. Contrary to Mr. Clu's claim, Mr. Gonzalez pursued the very strategy that he is claiming Mr. Gonzalez failed to pursue. Let me tell you how. To be fair, none of the defendants in this case put on actual evidence that the cocaine came from the other boat. Of course they didn't, because there wasn't any such evidence. It was all by suggestion, and the unified defense theory began in opening statements when Mr. Stuart Abrams, who on behalf of Valoi said, he used some analogy that to me was rather opaque, but the gist of it was that the government was putting the defendants in the wrong room with the cocaine. Then Mr. Gonzalez, on behalf of Mr. Clu's client now on appeal, said that there would be no evidence to show that the Coast Guard witnesses saw cocaine packages being jettisoned from the boat in this case. He said that there would be no video, no radar, no ion scans with trace evidence of cocaine to show that these witnesses actually saw cocaine being jettisoned. Then Mr. Feigenbaum on behalf of Luis Felipe Valencia said, just because you see water on the ground doesn't necessarily mean that it's been raining. During cross-examination, the order of the witnesses cross-examining the government's witnesses was the same, Abrams, Gonzalez, and Feigenbaum. Abrams and Gonzalez's questions pretty much the same. Same type of questions. Even though the Coast Guard witnesses had said, I saw the cocaine being jettisoned from the boat, Mr. Gonzalez cross-examined the witnesses and all but called them liars. He said, you can't be sure that the bales you saw in the water were the same ones that you claim were thrown from the boat because there were no ion scans of the defendant's clothing to have with trace elements of cocaine. So Abrams and Gonzalez teed it up for Mr. Feigenbaum. He crossed the Coast Guard witnesses about the prior interdiction, the other case. Now we go to the defense case in chief. Mr. Feigenbaum calls an expert witness who says that the debris field extended three miles from the boat, which is not unusual according to the government's bottle. The other two co-defendants, they didn't cross-examine that witness. And then when Voloy took the stand and said, there was never any cocaine on my boat. I just hired these two co-defendants to take me to safety from death threats in Columbia. Mr. Abrams and Mr. Gonzalez, they didn't cross-examine him. They didn't dispute that account. Then you go to closing argument. But that's not blame shifting. Let me get there, Your Honor. I'm not done yet. By the time I get through closing argument, you're going to see where they're going with this. Abrams and Gonzalez closing mirrored each other. Abrams said, just because the government shows you cocaine does not make it ours. Then Mr. Gonzalez said he conceded that the cocaine bales were recovered by the Coast Guard, but he said, quote, they weren't throwing bales off of that boat. That's about as close as you can come without actually saying it that the bales that they recovered didn't come from this boat, that they came from the other boat. But why wouldn't you actually say it if you're counsel? I don't know. But they teed it up for Mr. Feigenbaum. He came in and he actually said it. But for Mr. Clue to get up here and say that his client made no attempt to shift the blame, that seems to me to be, at best, wholly inaccurate. Because all three lawyers worked together to advance the blame shifting theory of the defense, and each lawyer in his own way adopted, advanced, or exploited that theory. And under those circumstances, there was no conflict of interest. Mr. Gonzalez, by virtue of his purported loyalty to his client in the other case, didn't forego that. He went along with the other attorneys. And by his cross-examinations and his closing argument, he advanced that unified theory of the defense. Did the government argue in its closing that there was a conspiracy among the members of both boats? The government did not argue that there was an overarching conspiracy. Because the government, there was no evidence that there was an overarching conspiracy. The only thing that Mr. Clark said was that there's a connection between these two vessels. What does that mean? What does a criminal connection mean if not a conspiracy? Because in a conspiracy, your honor, the people on the two different boats would have had to know that they're part of a conspiracy. The conspiracy, you don't have to prove that they knew each other or that they knew all of the goals of the conspiracy or all of the other co-conspirators. But at the very least, they have to know that they're part of an overarching conspiracy. So yes, there was a connection. You'd have to be blind to see that there wasn't because both of these boats came from Columbia. They came within a day of each other. And the packages of cocaine were virtually identical. Doesn't that weigh? No. Mr. Big in Columbia is sending a whole fleet of boats with cocaine. But that doesn't mean that all the people on these boats know that they're part of a conspiracy. If there is only a quote, unquote, connection, isn't that a good reason to wait for all of these individuals? When, your honor? At the very beginning. Well, again. We have to write an opinion that not only addresses the claims on appeal and resolves them on the appropriate standards of review, but we want to tell district courts and magistrate judges what they should and shouldn't be doing. And my view may not be shared by my colleagues, but I'm certainly interested in figuring out whether or not, as a prophylactic matter, it makes sense to appoint the same defense lawyers for defendants whose alleged crimes have a connection. Judge Snow didn't know there was a connection when she appointed the lawyers for all of them at the same time in Key West. When were they all appointed? At one hearing? The initial appearance. Yes. The initial appearance. All six of the defendants from both cases come in, and Judge Snow appoints three lawyers, or two defendants per lawyer. There's nothing to indicate to Judge Snow at that time that these cases have a connection. That connection didn't even become apparent until these defendants put on their blame-shifting defense at trial. That can't be possible, because the government certainly knew there was a connection before. The government didn't know. The Coast Guard knew. The government didn't know. The Coast Guard is the government, Mr. DeRosa. We're not all fungible, Your Honor. The Coast Guard didn't pass on that information to the people in Key West. Mr. DeRosa, with all respect, sometimes the government is held to the knowledge that some of his investigative agencies have. You're telling me that if the Coast Guard believed that there was a conspiracy, that that meant nothing to the overall picture? Who are you blaming? Are you blaming the government for not knowing, or the magistrate judge? Because the magistrate judge had no idea there was any connection. I'm not blaming anybody. Coast Guard may have known, and perhaps we should have known. Perhaps we should have asked more questions of the Coast Guard. I don't know what caused us to do that. By the time the case went to trial, what did the government believe? Is there anything in the record to show what the government thought about these two cases? It's not in the record. I've talked to Ms. Yvonne Rodriguez-Shack, who indicted both cases. She had no idea that they were related. So maybe we screwed up, Your Honor. No, I'm not blaming anybody. I'm just saying maybe all the better reason to suggest that district judges and magistrate judges shouldn't do this, so that things like this don't arise. That's a rhetorical argument for another day. And that's something, if you want to exercise your supervisory powers and tell the magistrate judge that in all cases like this, appoint separate lawyers for everybody, that's great. I don't have a problem with that. When Judge Snow determined that there was a potential conflict in this case, she acted right away. And what she did was proper. And I can't fault her for anything she did in this case. Was the other case tried after this one or before it? This was the first trial in May. That was my impression. At the time of this trial, the other trial had not taken place. This trial occurred between May 8 and May 10. Then the Garcia hearing May 23, and then the second trial in June, early June. And is that case on appeal? Well, all the defendants were convicted. I don't know if the case is on appeal or not, to tell you the truth, Your Honor. OK, so in terms of the hearing, they were also looking at whether they could continue to represent them going forward in the other case. I don't know. In the Garcia hearing, because the other people had not been tried yet, the other three defendants, so that's why all six of them were there. They had two issues to resolve. One was what had happened at the prior trial, and also what was going to happen going forward in the other case. But it was all looking forward, because the idea was, is there a potential conflict here? The premise of Mr. Kluge's argument is that there was an actual conflict from the get-go. And he has failed to demonstrate that. He has failed to demonstrate that there was ever an actual conflict. So potential conflicts are always forward-looking. And the magistrate judge took care of that the best way she could have. There are no other questions. I'll sit down. Thank you very much, Mr. DeRosa. Unless the court has any questions, I will sit down also. OK. Thank you very much, Ms. Deitch. You've preserved all of those claims, obviously, on appeal. You want to cede your time to him? Yes. Thank you. No problem. Your Honor, since I've been ceded the time, I just want to make one point about jurisdiction. The government position is so strained on jurisdiction, they would suggest that you don't have to prove a high seize. The jury doesn't have to make a determination that the vessel's Mr. Kluge, let me stop you for a second. Ms. Deitch has laid out her arguments and acknowledged that, unfortunately for her position, right now those claims are barred by circuit precedent. She didn't get involved in a substantive discussion of them. And therefore, Mr. DeRosa didn't have a chance to respond. So I think you should stick to the arguments that you addressed in your argument. All right. The notion that I did something wrong by saying that my client's lawyer didn't try to shift blame to the other boat is just horrific. It's just horrific to say that. He didn't do anything. He never mentioned the other boat. He never mentioned the concept of the other boat. He stayed away from it. He didn't in cross-examination or anything. Let me ask you this question, Mr. Kluge. What obligation, if any, did the defense lawyers have to alert the district court to a possible conflict once they had spoken to both sets of clients? Well, they had some obligation. But the notion the court's proceeding from is this blind notion that they walked into this initiative. No, I'm not proceeding from any notion. All of you are trying to put thoughts and words into my mouth, and they're not there. I'm guessing. I'm just asking a question. My question is, any criminal defense lawyer who is good, and these were good defense lawyers, is going to speak to each client at some point after appointment. I would think that at some point, they're going to get some information, which maybe, if not direct, is going to tell them, hmm, maybe there's a connection. Use Mr. DeRosa's word. I'm trying to divert, because the court's getting into a legal, ethical, metaphysical question about defense practice. No, it's not metaphysical. For example, Bruce Cutler, representing John Gotti. Wait, Mr. Cutler. He doesn't want to get off the case. It's the court that wants him off the case, because it's the integrity of the process that's infected. And maybe one defendant has a stronger sway. So you can't say for sure what the defense attorney's responsibility is. Well, that's my question to you, Mr. Clue. And it's not metaphysical. It's here and now, and it's practical. My question is, what, if any, and if you think the answer is none, great. What, if any, duty or responsibility does a defense lawyer have in this scenario to alert the court of a potential conflict or an actual conflict so that a Garcia hearing is held? When the government has equal or better knowledge of the facts, I think the defense counsel has no obligation. I think it borders on contradicting zealous advocacy to do that, because what you're doing then is inviting the government to flip one of the clients. That's why it's the government that files these Garcia hearings. No, it doesn't necessarily invite the government to flip anybody. Nobody flipped in this case. My client was convicted already. He was facing. No, we're talking about before trial. Right, exactly. Where no one's been convicted. No one's gone to trial. No one has shifted blame or avoided shifting blame. I understand. But again, my guess is wrong. The point is, at the initial appearance, there's complaints. The notion that this is some surprise, that, oh my gosh, everybody should have been just, oh my god, what happened here? How could this, how could nobody have seen this? The complaint says exactly what happened. The complaint shows exactly what happened. They were tracking these 640. They were tracking the other 640. They were tracking this panga. They were tracking the other panga. They picked up this one first. They picked up the other one second. These complaints are in front of the magistrate at the time then the joint appointments. OK, they were 36 hours apart, correct? The captures were 36 hours apart. The tracking was not. The tracking is what's going on, Ed. They're out there in the same, it's the same vessel tracking these two boats going the same place. What's so interesting to me about this case is typically the government would indict it altogether, but they separated these cases from the get-go, which was some evidence to me that the government plausibly thought, because of the frequency of all of this, as we all well know and see, they were two separate cases. They didn't indict them together, right? There were two separate indictments. They didn't. There's all kinds of reasons. Two separate grand jury proceedings, right? There's all kinds of reasons why they do that. No, I'm just trying to make sure the government, you say the government knew, had all this knowledge from the get-go, but they indicted them separately. Right. And they didn't try to attribute to your clients the 600 kilograms on the other boat of the other conduct either, did they? They did. It's exactly what they did at trial. Mr. Clark is sitting right here. No, but that's because your client, one of the lawyers at trial brought up the other boat. Government didn't bring up the other boat first. Your client. That's not true. The government brought up the whole story. The government brought up the whole story. The government asked questions. It wasn't just in cross-examination. We were the ones that were actually, you know, impeded to some extent from asking about it. The government, they had to. Who was the lawyer? Was Mr. Gonzales the lawyer for your client at trial? That's correct. Okay. And you're representing, because I'm going to go back and look, that he never said one word about the blame shifting. Well, unless you are going to. No, it's a simple question. He never said a word about it. Okay. And if I'm wrong, to attack me for it? What is that? What is that? And the basis for attacking me for it is because he said nothing came off of that boat? That's making me a liar? What is that? This case isn't worth that. It's not worth those allegations. Mr. Kluge, calm down. Lawyers often suggest that their brethren on the other side may have gotten something not quite right. Sometimes they use language that's more forceful. You, on occasion, have used such forceful language. No one takes it as a slight. Everyone is just trying to argue a case to the best of his or her ability. Your Honor, your Honor has litigated against me for 25 years where I have never, I don't think I have ever personally accused somebody of misrepresenting things in that way. I don't think so. If I have, I apologize to everybody. I apologize to them in the room. But to say, because my client said there was no cocaine coming off of that boat, that I'm a liar? Mr. Kluge. That's what this is about. It's not that big of a case. Mr. Kluge, this case. They should go back on a remand. Mr. Kluge, this case is not about you. And Mr. DeRosa's argument is, the way he reads the record, is that there were some inferences or allusions by Mr. Gonzalez to the other boat. It's not true. Hold on. And in his view, that diminishes your argument that Mr. Gonzalez did not attempt to shift blame. That's something we're gonna have to figure out. And I just mentioned that was not argued in their brief either. And that's why it's another reason why you have these, if you get a personal attack, make it in the brief. Give me a chance to respond. Okay, Mr. Kluge, thank you very much for your argument. We appreciate it.